FILED
2019 Mar-01  PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

PHILLIP GOWENS,

     PLAINTIFF,

                                      CIVIL ACTION NO.:

v.

CAPELLA UNIVERSITY,
INC., EQUIFAX INFORMATION SERVICES,
LLC and HIGHER EDUCATION LOAN
AUTHORITY OF THE STATE OF MISSOURI,
d/b/a MOHELA,

     DEFENDANTS.                     ***JURY DEMAND***

## COMPLAINT

Plaintiff Phillip Gowens ("Plaintiff"), by and through the undersigned counsel, and with knowledge as to Plaintiff's own acts, upon information and belief and investigation of counsel as to the acts of others, believing such allegations have evidentiary support after a reasonable opportunity for further investigation or discovery, alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an action for an actual, statutory and punitive damages, costs and attorneys' fees pursuant to 15 U.S.C. §§ 1681, *et seq*. ("Fair Credit Reporting Act" or "FCRA"), 15 U.S.C. § 1692, et seq. ("Fair Debt Collection Practices Act" of "FDCPA"), and state law claims.

2.     Moreover,

Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies. In 1970, the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA") was enacted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. v. Burr, 551 U.S. 47, 52 (2007). Towards that end, the FCRA requires a company that reports consumer credit information, referred to as a consumer reporting agency ("CRA"), to "adopt reasonable procedures for meeting the needs of commerce" which are "fair and equitable to the consumer." 15 U.S.C. § 1681(b).

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

3.    Congress made the following findings when it enacted the FCRA:

**(1)** The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

**(2)** An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

**(3)** Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

**(4)** There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15    U..S.C. § 1681(a)(1-4).  Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and

other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b).   Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

16    Congress, when it enacted the FCRA in 1970, mandated the existence and use of reasonable procedures to assure the maximum accuracy of the personal and financial information concerning consumers compiled and sold to users by consumer reporting agencies ("CRAs"), such as Equifax.

17    On December 4, 2003, President George W. Bush signed into law the amendments to the FCRA entitled the Fair and Accurate Credit Transactions Act ("FACTA"), Pub. L. No. 108-159 (2003):

> This legislation gives consumers unprecedented tools to fight identity theft and continued access to the most dynamic credit markets in the world. With a free credit report and powerful new tools to fight fraud, consumers have the ability to better protect themselves and their families.[1]

---

[1]  http://georgewbush-whitehouse.archives.gov/news/releases/2003/12/20031204-3.html   as   of February 28, 2019.

19.     FACTA was enacted to, *inter alia*, "prevent identity theft, improve resolution of consumer disputes, [and] improve the accuracy of consumer records."[2]

20.     Prior to 2003, victims of identity theft were afforded no special protections under the FCRA.  As such, consumer reporting agencies, including Equifax were under no obligation to treat an identity theft claim any different than a regular dispute.

21.     The FACTA amendments made it easier for identity theft victims to remove items of information that appeared on credit reports as a result of identity theft.

22.     Toward this end, Congress provided "powerful new tools" to consumers, including the right to dispute information due to fraud, obtain free credit reports due to identity theft and the right to request the truncation of Social Security numbers on consumer disclosures (commonly referred to as credit reports).

23.     FACTA also imposes additional duties on CRAs to repair the damage done to identity theft victims' credit files by blocking information that is the result of identity theft.

24.     Specifically, CRAs are required to block the reporting of any information in the file of a consumer that the consumer identifies is a result of identity theft, not later than 4 business days after receiving (1) appropriate proof of

---

[2]  Pub. L. No. 108-159 (2003)  http://www.gpo.gov/fdsys/pkg/PLAW-108publ159/pdf/PLAW-108publ159.pdf   last visited February 28, 2019.

identity; (2) a copy of the identity theft report; (3) the identification of such information by the consumer; and, (4) a statement by the consumer that the information is not information relating to any transaction by the consumer.  15 U.S.C. § 1681c-2(a).

25.    The ability to obtain a "block" of information is especially important to consumers because once a block is in place, the account is permanently removed from the consumer's credit report and creditors are prohibited from sending the blocked account to collections.  *See* 15 U.S.C. § 1681m(f).

26.    On the other hand, when a dispute is made without a claim of identity theft may result in the deletion or suppression of an account, but the creditor may continue with collection efforts.  *See* 15 U.S.C. § 1681i.

27.    A CRA may decline to "block" disputed information only if the CRA reasonably determines that the consumer's request is based on a material misrepresentation or made in error.  *See* 15 U.S.C. 1681c-2(c)(1).

28.    When a CRA declines to block information disputed pursuant to § 1681c-2(a), the CRA must notify the consumer, in writing, of the business name and address of any furnisher that it contacted upon receiving the identity theft report and that the consumer has a right to add a statement to the file disputing the accuracy or completeness of the disputed information.  *See* 15 U.S.C. §§ 1681c-2(c)(2) and 1681i(a)(5)(B).

29.     When a CRA does not determine that a material misrepresentation or error occurred, it cannot decline to block before it requests additional information from the consumer for the purpose of determining the validity of the alleged identity theft. *See* 12 C.F.R. § 1022.3(i)(1)(iii)(A).

30.     "[I]f a CRA receives a police report containing detailed information as well as the signature, badge number, or other identifying information for the officer taking the report, it is not reasonable for the CRA to request additional information without 'an identifiable concern,' such as an indication that the report was fraudulent." *Osada v. Experian Info. Solutions, Inc*., No. 11-C-2856, 2012 WL 1050067, at *3 (N.D. Ill. Mar. 28, 2012) (citing 16 C.F.R. § 603.3(c)(1) (renumbered at 12 C.F.R. § 1022.3(i)(3)(i)).

31.     Despite the FCRA's requirements, Equifax regularly declines to block the reporting of fraudulent information by wrongfully rejecting valid identity theft reports outright and relying instead on the same verification process it uses for non-identity theft disputes.

32.     In violation of the FCRA, Equifax willfully and negligently failed to provide the plaintiff the notice required by 15 U.S.C. § 1681c-2(c)(2) after declining to block information that, pursuant to 15 U.S.C. § 1681c-2(c)(1), Plaintiff alleged as the result of identity theft.

33.     In further violation of the FCRA, Equifax willfully and negligently declined to block the reporting of information alleged by Plaintiff to result from

identity theft in violation of 15 U.S.C. § 1681c-2(a), despite receipt of all required documentation from the plaintiff.

34.     The plain language of § 1681c-2 is clear, and Equifax is on notice of its requirements, both from the guidance of the Federal Trade Commission and the prior decision in *Osada, supra*.

35.     According to standardized policies and procedures, Equifax willfully treats valid identity theft claims as regular credit report disputes.

36.     Any identity theft claims Equifax deems to be lacking in information, Equifax willfully, and according to its standardized policies and procedures, declines to block the reporting of the fraudulent information outright rather than requesting additional information or documentation directly from the consumer (as it did with Plaintiff) and as required by 12 C.F.R. § 1022.3(i)

37.     Likewise, the FCRA imposes duties on persons who furnish information to CRAs ("furnishers").   *See* 15 U.S.C. §§ 1681s-2(a), (2), (4), (5). Specifically, furnishers must satisfy five duties after receipt of notice of a consumer dispute from a CRA.  15 U.S.C. § 1681s-2(b)(1)(A-E).

38.     Equifax has been sued thousands of times wherein an allegation was made that said defendant violated the FCRA.  Moreover, Equifax is sued hundreds of times per year wherein an allegation is made that Equifax reported inaccurate information due to identity theft.

39.     Equifax maintains records of lawsuits filed against it, and the lists are readily accessible to Equifax.

40.     Equifax has produced such a list to the undersigned.

41.     Equifax regularly receives complaints from the Consumer Financial Protection Bureau and Federal Trade Commission concerning other similar incidents.

42.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).

43.     Equifax has been ordered in single plaintiff FCRA lawsuits to produce discovery responses on the number of times it has been sued.

44.     Likewise, all of the defendants have received consumer complaints directly from consumers and indirectly from other organization, such as the Better Business Bureau, and government agencies, concerning other similar incidents.

45.     The sale of consumers' most private and sensitive personal and financial information is a multi-billion-dollar industry for the CRAs.   Equifax

reported more than $3.3 billion in operating revenue in its annual report for year ending in 2017.[3]

46.    Mohela is "one of the largest nonprofit student loan secondary markets in America . . . and a leading holder and servicer of student loans with $54.8 billion in student loan assets serviced as of June 30, 2018."[4]

47.    In 2011, Mohela entered into a contract with the federal government to become a non-for-profit servicer and to service federal assets.  Mohela "is servicing 2.0 million federal asset accounts, representing approximately $37, billion in student loans, as of June 30, 2018."  *Id*.  In 2018, Mohela, a non-for-profit servicer, received over $44,000,000 in servicing fees from the federal government.

48.    Capella reported more than $440 million dollars in revenue for year 2017.[5]

## JURISDICTION & VENUE

49.    This Court has jurisdiction pursuant to 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331 and 1367a.

50.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

---

[3] https://investor.equifax.com/~/media/Files/E/Equifax-IR/Annual%20Reports/2017-annual-report.pdf   Last visited February 28, 2019.

[4] Mohela's Report of Financial Statements and Schedule of Expenditures of Federal Awards, Sept. 12, 2018.

[5] https://www.businesswire.com/news/home/20180301006491/en/Capella-Education-Company-Reports-Fourth-Quarter-Full  Last visited February 28, 2019.

51.    Plaintiff is an adult individual and resides at 2322 Fairview Road, Gadsden, Alabama 35904.  Plaintiff is a "consumer" as defined by 15 U.S.C. § 1681a(c).

52.    Defendant Equifax does business in this judicial district and is a Georgia corporation with its principal place of business in Georgia.  Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties.  Equifax disburses such consumer reports to third parties of contract for monetary compensation.  Equifax outsources business processes, including consumer disputes to other countries, such as Mumbai, India.  One of Equifax's dispute vendors is Intelenet.  Equifax also outsources business processing services, including processing consumer disclosure requests and disputes, to companies in the Philippines and Costa Rica.

53.    Equifax sells millions of consumer reports (commonly referred to as "credit reports" or "reports") per day and also sell credit scores. Equifax's primary business is the sale of consumer reports.  Pursuant to the FCRA, Equifax must follow reasonable procedures which assure that the reports they sell meet the standard of "maximum possible accuracy."   15 U.S.C. § 1681e(b).

54.    Defendant Missouri Higher Education Loan Authority ("Mohela") is a person who furnishes information to consumer reporting agencies under FCRA, 15

U.S.C. § 1681s-2[6], and conducts substantial and regular business activities in this judicial district.  Mohela is a foreign corporation with its principal place of business located at 633 Spirit Drive, Chesterfield, Missouri 63005.

55.     Defendant Capella University, Inc. ("Capella") is a foreign corporation with its principal place of business located at 225 S 6TH ST FL 9 Minneapolis, Minnesota 55402 and conducts substantial and regular business activities in this judicial district.

## FACTUAL ALLEGATIONS

56.     Capella is in the business of opening and processing school loans.

57.     In or around 2016 and 2017, an impostor applied for school loans with Capella in the name of "Phillip Gowens."

58.     The personal identifying information used in connection with the applications for credit purportedly concerned Plaintiff; however, Plaintiff did not apply for school loans with Capella.

59.     Plaintiff did not attend Capella or receive any benefits or services from Capella.

60.     Plaintiff, nor the impostor, upon information and belief, attempted to complete the educational program or otherwise attend classes at Capella.

61.     Capella failed to reasonably verify the identity of the applicant.

---

[6] Plaintiff is making a claim against Mohela under § 1681s-2(b).  Plaintiff is not making a claim against said defendant under § 1681s-2(a).

62.     Capella received funding for the school loans.

63.     Thereafter, Mohela began servicing the fraudulent loans.

64.     As the servicer, Mohela credit reported the loans to consumer reporting agencies, including but not limited to Equifax.

65.     Mohela credit reported to the consumer reporting agencies that Plaintiff opened the loans in or around December 2016 and January 2017.

66.     Thereafter, Equifax prepared consumer reports related to Plaintiff that included the fraudulent student loans.

67.     Plaintiff discovered inaccurate information on his credit reports in or around Spring of 2017.

68.     The inaccurate information includes but is not limited to school loans opened at Capella (one in 2016 and one in 2017), inquiries, employers, contact information and personal identifying information (hereinafter referred to as the "inaccurate information").

69.     Plaintiff disputed inaccurate information directly to Capella.

70.     Plaintiff disputed inaccurate information directly to Mohela.

71.     Plaintiff also disputed the inaccurate information to Equifax.

72.     The inaccurate information is false because it does not relate to Plaintiff or Plaintiff's credit history.

73.     The inaccurate information harms Plaintiff's credit reputation because it does not accurately depict Plaintiff's credit history and creditworthiness. At least

one of the loans was reported as 90 days late, 120 and 150 days past due and with an amount past due in February 2018, March 2018 and April 2018.

74.    Equifax prepared and issued credit reports concerning Plaintiff that included the inaccurate information. Plaintiff disputed the inaccurate information to Equifax.  Equifax continued to report the inaccurate information to third parties.

75.    Plaintiff provided a copy of an identity theft report no less than two times.  Equifax refused to block the disputed information and provide the appropriate notices to Plaintiff after receipt of valid identity theft reports.

76.    Plaintiff requested Equifax to provide him with the steps Equifax took when reinvestigating his dispute.  Equifax failed to provide him with the steps Equifax took when reinvestigating Plaintiff's disputes.

77.    Plaintiff requested Equifax to hide the first five digits of his Social Security number on his consumer disclosure.  Equifax failed to hide Plaintiff's Social Security number on Plaintiff's disclosure.

78.    At least one other consumer reporting agency deleted or suppressed the inaccurate information.  Upon information and belief, Equifax received referrals from at least one other consumer reporting agency concerning the inaccurate information and notifying Equifax that the inaccurate information was deleted or suppressed.   In response, Equifax did not delete or suppress the inaccurate information or take any action.

79.     At least one other consumer reporting agency blocked the inaccurate information.   Upon information and belief, Equifax received block notifications from at least one other consumer reporting agency concerning the inaccurate information, which notified Equifax that the inaccurate information was blocked from Plaintiff's file.   In response, Equifax did not block, delete, suppress the inaccurate information.

80.     After Plaintiff notified a consumer reporting agency of his dispute, Equifax, Experian and/or Trans Union notified Mohela of Plaintiff's dispute.

81.     Mohela notified Equifax, Experian and/or Trans Union that it verified the information reported by Mohela.

82.     As a part of Mohela's FCRA investigation, it did not:

a. contact Plaintiff concerning the accuracy of the disputed information;

b. contact third parties, including but not limited to Capella or law enforcement, concerning the accuracy of the disputed information;

c. review underlying account documents for either account, such as the applications for credit;

d. conduct any handwriting analysis on Plaintiff's signature or the signatures associated with the account, and in its own records;

    e. make a reasonable inquiry into the disputed information, including a review of a police report concerning the fraud and theft of Plaintiff's identity;

    f. review all relevant information provided by Equifax pertaining to the disputed information;

    g. modify or delete the false account information; or,

    h. mark or identify the accounts as in dispute.

83. At best, Mohela verified the false information by confirming some of Plaintiff's personal identifying information with the personal identifying information reported by Equifax or another consumer reporting agency.

84. Mohela notified at least one consumer reporting agency that its reporting of the inaccurate information reported by Mohela was accurate.

85. Mohela notified at least one consumer reporting agency that its reporting of the loans reported by Mohela was accurate after receipt of a block notification from a consumer reporting agency.

86. Mohela did not conduct a reasonable investigation with respect to the disputed information.

87. Mohela continues to receive monies from the federal government for servicing the fraudulent loans.

88. Despite Plaintiff's exhaustive efforts to date, the defendants have nonetheless deliberately, willfully, intentionally, recklessly and negligently

repeatedly failed to perform reasonable reinvestigations and/or investigations of the above disputes as required by the FCRA, have failed to remove all of the inaccurate information, have failed to note the disputed status of the inaccurate information and continue to report inaccurate information about Plaintiff.

89.     Similarly, Capella has failed to reasonably investigate Plaintiff's disputes.

90.     Capella received direct disputes from Plaintiff.

91.     Plaintiff requested Capella to provide him with all of the underlying account documents due to fraud.

92.     Capella did not provide Plaintiff with all of the underlying account documents.

93.     Capella did not perform any handwriting analysis related to Plaintiff's disputes or the loans.

94.     Capella did not perform any due diligence or otherwise make an inquiry into the driver's license information supplied by the impostor.

95.     Capella did not perform any due diligence or otherwise make an inquiry into the references supplied by the impostor.

96.     Capella did not perform any due diligence or otherwise make an inquiry into the addresses supplied by the impostor.

97.    Capella did not contact third parties, including law enforcement or the references listed on the promissory note or notes related to Plaintiff's disputes or the loans.

98.    Capella did not review all of its own records related to Plaintiff's disputes or the loans.

99.    Capella does not have a copy of a government issued identification card with or without a photograph in its records related to the loans.

100.   Capella does not have a student identification card with a photograph related to the loans, the impostor or Plaintiff.

101.   Capella did not notify third parties, including but not limited to the federal government or Mohela, that the loans were opened by an impostor.

102.   Capella kept the money paid by the federal government for the fraudulent loans.

103.   At all pertinent times hereto, Plaintiff was not responsible for the disputed debts.

104.   As of result of the defendants' conduct, Plaintiff has suffered actual damages in the form of unfavorable credit terms, harm to credit reputation and credit score, inaccurate FAFSA information, out-of-pocket expenses, interference with Plaintiff's normal and usual activities, stress headaches, stomachaches, sleeplessness, and emotional distress, including anxiety, humiliation and embarrassment.

105.   At all times pertinent hereto, the defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the defendants herein.

106.   At all times pertinent hereto, the conduct of the defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

107.   Defendants' conduct was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendants are liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law for their violations of the FCRA.

## COUNT ONE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Equifax)
### (Negligent Noncompliance with the FCRA)

108.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

109.   Equifax negligently failed to comply with the requirements of the FCRA.

110.    As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks damages in an amount to be determined by the jury.

111.    Plaintiff requests attorneys' fees pursuant to 15 U.S.C. § 1681o(a).

## COUNT TWO – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Equifax)
### (Willful Noncompliance with the FCRA)

112.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

113.    Equifax willfully failed to comply with the requirements of the FCRA.

114.    As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks damages in an amount to be determined by the jury

115.    Plaintiff also seeks statutory and punitive damages in an amount to be determined by the jury.

116.    Plaintiff requests attorneys' fees pursuant to 15 U.S.C. §1681n(a).

## COUNT THREE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Mohela)
### (Negligent Noncompliance with the FCRA)

117.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

118.   Mohela negligently failed to comply with the requirements of the FCRA.

119.   As a result of Mohela's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks damages in an amount to be determined by the jury.

120.   Plaintiff requests attorneys' fees pursuant to 15 U.S.C. § 1681o(a).

## COUNT FOUR – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Mohela)
### (Willful Noncompliance with the FCRA)

121.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

122.    Mohela willfully failed to comply with the requirements of the FCRA.

123.   As a result of Mohela's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks damages in an amount to be determined by the jury.

124.   Plaintiff also seeks statutory and punitive damages in an amount to be determined by the jury.

125.   Plaintiff requests attorneys' fees pursuant to 15 U.S.C. §1681n(a).

## COUNT FIVE – NEGLIGENT OR WANTON EXTENSION OF CREDIT
### (Against Capella and Mohela)

126.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

127.   Capella and Mohela owed Plaintiff a duty not to open or fund student loans using Plaintiff's personal identifying information without the knowledge or authority of Plaintiff.

128.   Said defendants had a duty to have and follow reasonable procedures to verify the accuracy of the personal identifying information proffered by the impostor.

129.   Said defendants failed to follow reasonable procedures and proper procedures in opening, approving, funding and disbursing funds for the student loans.

130.   Said defendants breached the aforementioned duties.

131.   As a result of said defendants' unlawful conduct, Plaintiff suffered harm, as more fully outlined above.

### COUNT SIX – NEGLIGENT OR WANTON HIRING, TRAINING, SUPERVISION OR RETENTION
### (Against Capella and Mohela)

132.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

133.   Capella and Mohela owed Plaintiff a duty to exercise reasonable care in hiring, training, supervising and retaining employees who opened the loans.

134.   As a result of said defendants' negligent or wanton hiring, training, supervision or retention, an impostor was able to open the student loans without Plaintiff's authorization or knowledge.

135.   Moreover, as a result of said defendants' unlawful conduct, Plaintiff suffered harm, as more fully outlined above.

## COUNT SEVEN – NEGLIGENCE OR WANTONNESS
### (Against Capella)

136.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

137.   Capella owed Plaintiff a duty to exercise reasonable care in investigating the disputed school loans.

138.   As a result of said defendant's negligence or wantonness, Capella did not notify the other defendants, Plaintiff or third parties that the loans were obtained by an impostor.

139.   Moreover, as a result of said defendant's unlawful conduct, Plaintiff suffered harm, as more fully outlined above.

## COUNT EIGHT – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (Against Mohela)

140.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

141.   Mohela is a "debt collector" as defined by 15 U.S.C. § 1692a(6) of the FDCPA.

142.   Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) of the FDCPA.

143.   The above reporting of the inaccurate information to credit reporting agencies by Mohela are "communications" relating to a "debt" as defined by 15 U.S.C. §§ 1692a(2) and 1692a(5) of the FDCPA.

144.   Any alleged debts at issue arose out of a transaction which was primarily for personal, family or household purposes.

145.   Mohela violated the FDCPA.

146.   Mohela's violations include, but are not limited to, violations of 15 U.S.C. §§ 1692e(2)(A), 1692e(8), 1692e(10) and 1692f, as evidenced by the following conduct:

    A. The false representation of the amount, character or legal status of a debt;

    B. Communicating or threatening to communicate to any person credit information which is known, or which should be known, to be false; and,

    C. Otherwise using false, deceptive, misleading and unfair or unconscionable means to collect or attempt to collect a debt from the Plaintiff.

147.   Mohela's acts as described above were done with intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of coercing Plaintiff to pay monies relating to the inaccurate information.

148.   As a result of the above violations of the FDCPA, Mohela is liable to Plaintiff in the sum of Plaintiff's statutory damages, actual damages and attorney's fees and costs.

## JURY DEMAND

149.   Plaintiff requests a jury trial on all claims.

## PRAYER

Wherefore, Plaintiff prays for judgment against the defendants as follows:

On the First Claim for Relief:

1.  Actual damages to be determined by the jury; and

2.  Attorneys' fees and costs.

On the Second Claim for Relief:

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury; and,

4.  Attorneys' fees and costs.

On the Third Claim for Relief:

1.  Actual damages to be determined by the jury; and,

2. Attorneys' fees and costs.

On the Fourth Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury; and,

4. Attorneys' fees and costs.

On the Fifth Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury; and,

3. Costs.

On the Sixth Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury; and,

3. Costs.

On the Seventh Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury, and,

3. Costs.

On the Eighth Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury; and,

4.  Attorneys' fees and costs.

Respectfully submitted,

*/s/ Micah S. Adkins*
Micah S. Adkins
ASB-8639-I48A
**THE ADKINS FIRM, P.C.**
1025 Westhaven Blvd., Suite 220
Franklin, Tennessee 37064
T:  (615) 370.9659
F:  (615) 370.4099
E:  MicahAdkins@ItsYourCreditReport.com
*Counsel for Plaintiff Phillip Gowens*